11 F.Supp.2d 1077 (1998)
EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,
Larry Jefferies and Perry Golden, Intervenors/Plaintiffs,
v.
GENERAL MOTORS CORPORATION and Intl Union, United Auto, Aerospace and Agricultural Implement Workers of America, Local 25, Defendants.
No. 4:96CV01547 GFG.
United States District Court, E.D. Missouri, Eastern Division.
February 4, 1998.
*1078 Thomas J. Borek, Robert G. Johnson, S. Robert Royal, Lloyd J. Vasquez, Jr., St. Louis, MO, for E.E.O.C.
Eric E. Vickers, Vickers and Associates, University City, MO, for Larry Jefferies, Perry Golden and Patricia Chatman.
Jerry M. Hunter, Gregg M. Lemley, Bryan Cave L.L.P., St. Louis, MO, for General Motors Corp.
*1079 David M. Stolze, Gerald Kretmar, Evan J. Beatty, Appleton and Kretmar, St. Louis, MO, for International Union, United Automobile, Aerospace, Agricultural Local 25 and Local 25 International Union, United Automobile, Aerospace & Agricultural Implement Workers of America.

MEMORANDUM AND ORDER
GUNN, Senior District Judge.
This matter is before the Court on defendants' motions for summary judgment. (Docs.75, 79.) Both plaintiff, the EEOC, and the intervenors have opposed both motions. (Docs.90, 91, 92, 93.) From the evidence presented, the Court concludes that genuine issues of material fact remain and that summary judgment should be denied.
The EEOC filed this action alleging that defendants General Motors Corporation (GM) and Local 25 of the United Automobile, Aerospace and Agricultural Implement Workers of America (the union) discriminated against the charging parties on the basis of race and sex in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e et seq. Three supervisors for GM, Larry Jefferies, Perry Golden, and Patricia Chatman, alleged that they were harassed by Robert Wilson, a Committeeman for Local 25 and an employee of GM, and that defendants failed to take appropriate action to end the harassment.

I. Facts
Jefferies and Golden are black male supervisors, and Chatman is a black female supervisor for GM. Jefferies and Golden alleged several incidents of racial harassment, and Chatman alleged incidents of racial and sexual harassment by Committeeman Wilson from July 1992 to July 1994. Among the incidents the charging parties testified to are the following:
In discussing Jefferies' outfit, Wilson stated, "I can tell you what doesn't go with Black, but I better not say that." Upon learning that Jefferies would be driving south on route 55, he said that his Uncle Buck was the sheriff down there and that they didn't allow Jefferies' "kind of people" in town. Upon learning that Jefferies was considering buying land south of St. Louis, Wilson said that Jefferies didn't want to live there because "somebody may have a bar-bque" on Jefferies' front lawn. He told others in Jefferies' presence that Jefferies did not know how to read and made statements about Jefferies going back to Arkansas to "pick cotton." Wilson interrupted a conversation Jefferies was having with another employee about a bar in Tennessee to ask "They didn't lynch you in that bar?" Wilson called Jefferies "boy" on at least one occasion.
Wilson also called Golden "boy" at least twice and told Golden to "go pick cotton." He said that Golden was "dark and black" and referred to himself as "white and light." He told Golden several times about how his "Uncle Buck" was a sheriff in a county south of St. Louis and would harass blacks who passed through.
Wilson told Chatman that she was upset that she had not been promoted and that she could not "f____ her way to the top." Wilson, as the Committeeman, attended a disciplinary interview during which Chatman charged a male employee, Dave Horton, with blocking her path and holding a door closed so she could not pass. During the interview, Wilson said, "Dave, she really likes you but she doesn't want anyone else to know." He suggested that Chatman had not been trying to open the door but had been trying to hold Horton's hand. He asked Horton if he would date Chatman. Wilson told Chatman that "women should be at home and not in positions of authority." Wilson sometimes called Chatman "sister."
In addition to the explicit racial and sexual incidents, the charging parties testified that Wilson repeatedly shouted at them, many times using profanity. He used threatening body language, standing too close or putting his finger in the face of the supervisors, and invited them to fight. The supervisors testified that Wilson did not treat white male supervisors in the same way.
The record indicates that GM officials met with union officials and Wilson in July 1992, at least in part to discuss Wilson's behavior, specifically his use of the term "boy" in addressing black supervisors. The record also includes an undated draft letter to Jim Wells, a union official, from J.D. Rietzke, the manager *1080 of the Hazelwood plant, outlining several instances of harassment and stating that "Mr. Wilson, virtually from the day he assumed his position, has continually verbally assaulted black supervisors Patricia Chatman, Perry Golden and Larry Jefferies with assorted derogatory remarks containing very clear racial overtones and implications." The letter was apparently not sent, and instead Mr. Rietzke sent a shorter letter dated October 9, 1992 that stated "[o]ur minority employees are still being subjected to derogatory and harassing type behavior with clear racial implications."
The supervisors testified that they had been instructed by upper-level management to place Wilson on notice for racially or sexually harassing conduct. They testified that there were several occasions in which they did not put Wilson on notice for incidents they viewed as harassing. They also testified, however, that on many occasions when they put Wilson on notice, he did not receive discipline. If he did, that discipline was often later removed and Wilson was paid for time off. Chatman specifically testified to an incident in which she placed Wilson on notice for failing to obey her direct order to leave the area, and Wilson was not disciplined because there was not another management employee in the area to witness the incident. On several of those occasions in which the supervisors did not discipline Wilson, they instead reported the incidents to upper-level management, as allowed under GM's open-door policy.
Both the charging parties and upper-level managers testified that Wilson's record was cleared of discipline on two occasions in order to facilitate GM's reaching an agreement with the union. Rietzke testified that on one occasion Wilson's grievances were negotiated as part of "the whole package," that he recognized that it wasn't ideal for Wilson's grievances to be negotiated, "but the fact of the matter is they needed to be as part of that package." Ronald Newton, GM's Director of Industrial Relations, testified that the grievances were negotiated at a point when "there was a potential strike situation," and that "the union has a great deal of interest in protecting the interests of the representatives."
Wilson was terminated by Golden in July 1994 for using the word "nigger."

II. Law
The Eighth Circuit has cautioned that "summary judgment should seldom be granted in employment discrimination cases." Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir.1994). Only in rare cases when there is no dispute of fact and there exists only one conclusion should summary judgment be granted. Id. The Court reasoned that "[b]ecause discrimination cases often depend on inferences rather than on direct evidence, summary judgment should not be granted unless the evidence could not support any reasonable inference for the nonmovant." Id. If, however, "the plaintiff fails to establish a factual dispute on each element of the prima facie case, summary judgment is appropriate." Bialas v. Greyhound Lines, Inc., 59 F.3d 759, 762 (8th Cir.1995).
Title VII is violated when workplace harassment based on race or sex creates a hostile work environment. See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66-67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). To establish a claim of environmental harassment, plaintiff must show that: (1) the charging party belongs to a protected group; (2) the charging party was subject to unwelcome harassment; (3) that harassment was based upon the protected status; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take proper remedial action. See Quick v. Donaldson Co., 90 F.3d 1372, 1377 (8th Cir.1996).
A hostile environment is created by evidence of conduct that creates a workplace permeated with "discriminatory intimidation, ridicule, and insult." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). "A work environment is shaped by the accumulation of abusive conduct, and the resulting harm cannot be measured by carving it `into a series of discrete incidents.'" Hathaway v. Runyon, 132 F.3d 1214, 1222 (8th Cir.1997) (quoting Burns v. McGregor Electronic Industries, 955 F.2d 559, 564 (8th Cir.1992)).

*1081 III. Analysis.
GM argues in its motion for summary judgment that plaintiff has not created a genuine issue of material fact that there was severe and pervasive harassment based on the charging parties' protected status or that GM failed to take appropriate remedial action. GM also argues that plaintiffs are not entitled to punitive damages. The union makes the same arguments as GM, and argues additionally that the union has no liability under Title VII for a hostile work environment claim.
Defendants argue that plaintiff fails on the third, fourth, and fifth elements of the prima facie case. Specifically, defendants first argue that the harassment by Wilson was not based on the charging parties' protected status, but was instead directed at all management employees. Although the record includes some testimony to that effect, it also includes evidence that black supervisors and women were treated worse by Wilson than white male supervisors. Even the actions and comments by Wilson that were not explicitly racial or sexual may constitute discrimination if they were directed at members of a protected class more than toward individuals who are not in a protected class. See Hathaway, 132 F.3d 1214, 1222 (not every aspect of hostile environment need be explicitly sexual in nature to be probative).
The defendants argue that the harassment was not sufficiently severe or pervasive to affect the conditions of employment of the charging parties. The Court finds that plaintiff has created a factual dispute on this issue, considering the general harassment as well as the explicitly racial and sexual incidents.
Defendants also argue that the plaintiff cannot demonstrate that they failed to take appropriate remedial action. GM argues that because the charging parties were the supervisors empowered with the authority to discipline Wilson, they cannot complain if they failed to discipline him. Although the Court agrees that the supervisory status of the charging parties is relevant to the determination of whether GM took appropriate action, the Court finds that the plaintiff has created a genuine fact issue as to whether the supervisors had the power to discipline Wilson sufficiently to end the harassment, and thus whether GM took proper remedial action. See Hathaway, 132 F.3d 1214, 1224 (remedial action must be calculated to end harassment).
The union also argues that Title VII does not impose liability on a union for discrimination respecting an individual's terms and conditions of employment. The union argues that because the employer has exclusive control over the terms and conditions of employment, only the employer can respond to a hostile work environment claim. In addition to holding a union liable for discriminatory practices against its membership, section 703(c)(3) makes it unlawful for a union "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e-2(c)(3). The union argues that there is no proof that it caused GM to discriminate against its supervisors. Plaintiff argues that the union repeatedly ratified Wilson's discriminatory actions and actively opposed any attempt to discipline him. Viewed in the light most favorable to plaintiff, the evidence in the record supports a finding that union officials were aware that the supervisors felt Wilson's conduct was racially and sexually harassing, and that the union, in any event, encouraged the company to clear Wilson's disciplinary record in order to reach a collective bargaining agreement.
The union also argues that the union is not liable for alleged discriminatory conduct directed at or affecting individuals it does not represent. The Court recognizes that this situation, in which non-union members are attempting to hold a union liable for discrimination, is unique. The parties have not cited any similar cases. The Court finds, however, that the language of section 703(c)(3) does not limit the union's responsibility for discrimination to actions against its membership, referring instead to "individuals." Neither does the Court find a basis for such a distinction in the case law. See Donnell v. General Motors Corp., 576 F.2d 1292, 1300 (8th Cir.1978) ("[l]abor unions, as well as employers, have an affirmative duty to take corrective steps and to insure compliance with Title VII").
*1082 The Court rejects the union's argument that holding it liable for the hostile work environment would conflict with its duty of fair representation. Union members do not have a right to arbitration for every grievance they file, see Vaca v. Sipes, 386 U.S. 171, 190-91, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967), and a union does not breach the duty unless its conduct is "`arbitrary, discriminatory, or in bad faith,'" Washington v. Service Employees Int'l Union, Local 50, 130 F.3d 825, 826 (8th Cir.1997) (quoting Vaca, 386 U.S. at 190, 87 S.Ct. 903). The union has no duty to represent members for discipline they incurred for engaging in sexually or racially harassing conduct. See Ooley v. Schwitzer Div., Household Mfg., Inc., 961 F.2d 1293, 1304 (7th Cir.) (union has no duty if employee's claim lacks merit), cert. denied, 506 U.S. 872, 113 S.Ct. 208, 121 L.Ed.2d 148 (1992). Although the Court believes the union should bear no responsibility for representing Wilson on grievances if it believed that his conduct was not racially harassing based on the merits of the incidents, the union may be liable if it demanded a clearing of grievances across-the-board regardless of the merits of the incidents in question.
The Court need not decide whether the facts support an entitlement of punitive damages at this time.
IT IS HEREBY ORDERED that defendants' motions for summary judgment (Docs.75, 79) are DENIED.